IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:19CR166 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN A. POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM KOZERSKI, | ) | UNITED STATES OF AMERICA'S |
| | ) | SENTENCING MEMORANDUM |
| Defendant. | ) | |

Now comes the United States of America, by and through its counsel, Justin E. Herdman, United States Attorney, and Chelsea S. Rice, Assistant United States Attorney, and respectfully submits this memorandum setting forth the United States' position regarding the sentencing for Defendant William Kozerski ("Defendant"). For the reasons set forth below, as well as those to be articulated at the sentencing hearing, the United States respectfully submits that a sentence within the Guidelines range set of 51 to 63 months, as forth in the Presentence Investigation Report ("PSR"), is appropriate in this case.

## FACTS

The following is derived from the factual basis agreed to by all parties pursuant to the Plea Agreement and the final Presentence Report. (R. 7: Plea Agreement, PageID 34-35; R. 7-1: Attachment A: Factual Basis and Relevant Conduct, PageID 39-47; R. 11: Amended Presentence Report, PageID 77-96).

From in or around January, 2007 and continuing to in or around February, 2015, Defendant and his co-conspirators devised and executed a scheme to obtain property by means of false and fraudulent pretenses, representations, and promises by unlawfully obtaining VA

1

contracts under the Service-Disabled Veteran-Owned Small Business Program ("the Program"). This scheme ultimately led to Defendant and his co-conspirators at CA Services receiving $11,891,243.45 in payments on the fraudulently obtained contracts.

## I. The Service-Disabled Veteran-Owned Small Business Program

Congress established the Program as part of a broader effort to assist service-disable veterans. The Program allows Federal contracting officers to restrict competition for certain contracts to Service-Disabled Veteran-Owned Small Businesses ("SDVOSB"). To qualify for the program, a service-disabled veteran must meet the following criteria:

(1) Have a service connected disability determined by the Department of Veteran's Affairs ("the VA") or Department of Defense ("DoD");

(2) Unconditionally own 51% of the SDVOSB, in which ownership is direct;

(3) Receive 51% of profits and/or the annual distribution profits paid on the stock for the SDVOSB;

(4) Control the day-to-day management, daily operations, and long term decision making of the SDVOSB; and

(5) Hold the highest officer position in the SDVOSB, to include control of the board of directors, if applicable.

The VA relies on honest self-certification from SDVOSBs that they are indeed owned and controlled by a service-disabled veteran and otherwise meet the above requirements. SDVOSBs wishing to participate in the program must submit certifications regarding their eligibility using online services including the Central Contractor Registry ("CCR"), the Online Representations and Certifications Application ("ORCA"), the VA's Center for Veterans

Enterprises ("vetbiz.gov"), and the System for Award Management ("SAM"). The servers for the former two systems are located in Battlecreek, Michigan and Sterling, Virginia respectively.

**II.     The Fraudulent Scheme**

Defendant was the General Manager of Rock Industries and the owner of Rockwell Properties and Strategic Construction Services. He is also listed as the Director of Operations for CA Services, a limited liability company incorporated in the State of Michigan. CA Services was engaged in general construction and government contracting services and did business in Michigan, Cleveland, Ohio, and elsewhere. In addition to defendant, the operating agreement for CA Services identified its members as J.R. (a service-disabled veteran), C.C., and J.M.

Defendant and CA Services represented that J.R. was the owner and primary point of contact for CA Services. However, as Defendant well knew, J.R. was not the owner of CA Services, did not control day-to-day management of CA Services, and did not receive 51% or greater of CA Services' profits. Indeed, after the initial meeting in which J.R. signed the operating agreement, J.R. had no involvement with CA Services. Furthermore, no one else at CA Services was a service-disabled veteran. Thus, CA Services clearly failed to meet the requirements to be considered a legitimate SDVOSB and participate in the Program. Despite this, Defendant and his co-conspirators conspired to hold CA Services out as a SDVOSB in an effort to defraud the government and took many overt acts in the Northern District of Ohio, Eastern Division and elsewhere in pursuit thereof.

Using this fraudulent misrepresentation of J.R.'s involvement, on or about July 28, 2007 Defendant registered CA Services in the ORCA database, acknowledged the requirements for an SDVOSB, and listed J.R. as the primary point of contact. Defendant provided an email and physical address for J.R. that was the same as those provided for Defendant and another listed

3

point of contact, J.M. As Defendant and his co-conspirators then well knew, J.R. was not involved in CA Services and did not have a role in submitting the ORCA registration.

In a similar fashion, on or about July 31, 2008 Defendant and his co-conspirators falsely reported in CA Services' vetbiz.gov registration that J.R. was the owner of CA Services. On or about December 28, 2009, Defendant and his co-conspirators registered CA Services in the CCR, falsely identifying J.R. as the primary point of contact for the company. These registrations were on several occasions resubmitted and updated, time and again falsely affirming that J.R. was the primary point of contact or owner and controller of CA Services, throughout the course of the fraudulent scheme.

Of course, the scheme was not limited to merely falsely certifying CA Services as a SDVOSB. In 2009 and 2010, CA Services unlawfully obtained the following VA Contracts set aside for SDVOSBs under the Program:

| Contract | Original Contract Award Amount | Award Date | Amount Paid to CA Services |
|---|---|---|---|
| Detroit VAMC Pharmacy Mixing Room Project | $655,447 | March 16, 2009 | $750,966.72 |
| Ann Arbor VAMC Radiology Construction | $431,000 | June 19, 2009 | $494,065.15 |
| Cleveland VAMC Pharmacy Expansion | $3,700,000 | September 29, 2009 | $4,469,644.74 |
| Ann Arbor VAMC Site Security | $151,000 | June 4, 2010 | $161,485.65 |
| Cleveland VAMC General Renovations | $1,720,000 | June 9, 2010 | $1,972,295.77 |
| Ann Arbor VAMC Linear Accelerator | $2,645,000 | June 25, 2010 | $4,042,785.42 |
| Total | $9,302,447 | | $11,891,243.45 |

In each of the above set-aside contracts, Defendant and CA Services followed a similar pattern. Defendant and his co-conspirators submitted false and fraudulent documents, falsely

4

representing that CA Services qualified as and SDVOSB and purportedly signed by J.R. on behalf of CA Services. In fact, J.R. had not signed the document and had no knowledge or involvement in soliciting the SDVOSB set-aside contracts. The VA awarded CA Services the contracts based on CA Services' false and fraudulent representations.

### III. The Use of Interstate Wires

In pursuit of the above conspiracy to defraud and deprive legitimate SDVOSBs the chance to bolster their businesses and compete in contracts set aside for them, Defendant caused a false and fictitious registration and certification document to be submitted electronically to SAM, a government contracting database, in which CA Services falsely identified J.R. as the point of contact for CA Services.

### IV. Plea Agreement and Guilty Plea

On April 2, 2019, Defendant entered into a plea agreement in which both parties agreed to recommend a sentence within the advisory United States Sentencing Guidelines ("the Guidelines") range and largely agreed to the factual basis. The parties did not agree on the loss amount to be used in determining the Guidelines computation, though the parties agreed not to argue the amount is less than $150,000 or more than $11,900,000. Defendant pleaded guilty to a single count charging that, from January 2007 through February 2015, the Defendant did commit the offense of Wire Fraud in violation of 18 U.S.C. § 1343.

## ARGUMENT

### I. Loss for purposes of sentencing is properly calculated at $11,891,243.45.

When calculating the proper Offense Characteristics level in a case of fraud, the amount of loss has considerable bearing. U.S.S.G. § 2B1.1(b)(1). Despite the importance of loss, the Sentencing Guidelines leave vague in the body of § 2B1.1(b)(1) how exactly to determine the

5

loss amount in a given case. Instead, the Guideline Commentary offers a vast array of loss calculations for any number of situations. One of these states that, "In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." U.S.S.G. 2B1.1(b)(1), cmt. n.3(F)(ii). In other words, in cases of fraud involving the redirection of government benefits from their intended recipients, the whole amount redirected is considered the loss amount for purposes of sentencing.

There is a circuit split as to whether or not Note 3(F)(ii) applies to cases involving programs designed to give exclusive opportunities to certain groups. The Fourth, Seventh, and Eleventh Circuits have found that such programs are to be considered government benefits and fall within Note 3(F)(ii)'s guidance, while the Fifth and Ninth Circuits have found the opposite. *Compare U.S. v. Brothers Const. Co. of Ohio*, 219 F.3d 300 (4th Cir. 2000) (applying Note 3(F)(ii)'s predecessor to a case involving fraudulent acquiring of contracts intended for "disadvantaged business enterprises"), *U.S. v. Leahy*, 464 F.3d 773, 790 (7th Cir. 2006) (stating definitely that the contracts given by "an affirmative action program aimed at giving exclusive opportunities to certain women and minority businesses … constitute government benefits") *and U.S. v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009) (citing favorably the findings in *Brothers Const. Co.* and *Leahy*) *with U.S. v. Harris*, 821 F.3d 589 (5th Cir. 2016) (finding that a defense contract awarded through an affirmative action contracting program was not a government benefit) *and U.S. v. Martin*, 796 F.3d 1101 (9th Cir. 2015) (opining that the "government benefits" note applies to unilateral government benefits like food stamps, not contracts).

The Fifth and Ninth Circuits' opinions, however, are limited in their ability to broadly inform. The *Harris* court took care to mention that the subject of the fraud in that case was a

6

defense contract, an example of fraud explicitly referenced in another comment to § 2B1.1(b)(1) as requiring the "general," rather than "government benefit," approach to loss calculation. 821 F.3d at 602-03 ("the general rule is particularly appropriate here, because this case involves a fraud affecting a defense contract award") (internal quotations omitted). The Fifth Circuit does not clarify the extent to which this facet of the case guided their decision and there is certainly no analogous note explicitly covering the Program in the instant case.

The Ninth Circuit in *Martin* relied on an exceptionally narrow construction of government benefits as a unilateral government assistance, finding that loans, grants, and entitlement program payments are essentially one-way streets, classifying them as "unilateral government assistance" distinct even affirmative action contract programs, which the court considered to be fee-for-service business deals. 796 F.3d at 1109. The court's classification of loans and grants as "unilateral government assistance" is not compelling, and its subsequent exclusion of affirmative action contract programs does not follow. The government does not merely give out loans and grants automatically; rather, there is an application process that can be quite competitive. Neither grants nor loans are gifted to the public free from expectations of returns; grants are to be used for specific purposes, many of which ultimately confer a benefit on the government, and loans build interest and are expected to be repaid. These realities are not consistent with the purely philanthropic implications of "unilateral government assistance," and the court offers no other reason why programs such as the instant Program should not be considered government benefits.

In any event, the Ninth Circuit's discussion of the applicability of Note 3(F)(ii) was not relevant to their holding in *Martin*, and is better read as dicta preemptively advising the lower court on how it ought to approach sentencing on remand. This part of *Martin* holds no mandatory

authority in its own circuit and thus stands tepid indeed against the greater number of circuits which fall on the other side of the split.

Far more persuasive is the court's reasoning in *Leahy*. 464 F.3d 773 (7th Cir. 2006). There, the court looked to the stated goal of the affirmative action program, which stated "[a]n effort to direct contracts to minority-and women-owned businesses is required to eradicate the effects of discrimination." *Id.* at 790. In other words, the program was "aimed at giving exclusive opportunities to certain women and minority businesses." *Id.* As such, it stood to benefit a particular class and was governed by the "government benefits" note of the Guidelines. Similarly, the goal of the Program is to give exclusive opportunities to service-disabled veterans and their small businesses. The opportunities in *Leahy* and the instant case may well have been the exclusive right to bid on government contracts, but they were undeniably benefits afforded to only a narrow class of small businesses.

Defendant further argues that, pursuant to the Sixth Circuit's decision in *United States v. Havis*, Note 3(F)(ii) is inconsistent with § 2B1.1(b)(1) and is thus invalid. 927 F.3d 382 (6th Cir. 2019) (en banc). Defendant's argument has no merit. *Havis* dealt with a situation in which the commentary to the Guidelines stood in direct opposition to what was explicitly stated in U.S.S.G § 4B1.2, which in relevant part defines "controlled substance offenses." *Id.* at 384. The commentary to § 4B1.2 included attempt crimes in its definition, whereas the body of § 4B1.2 contained a list of crimes that counted as "controlled substance offenses," none of which were attempt crimes. *Id.* at 386. The court held that, where the commentary stood in clear opposition to the text of the Guidelines, the text of the Guidelines controls. *Id.* at 387.

*Havis* has no bearing on the instant case. Unlike § 4B1.2, which explicitly defines "controlled substance offenses," § 2B1.1 merely states the word "loss" without further

8

explanation or elaboration. U.S.S.G. § 2B1.1(b)(1). The commentary then expounds on the ways one should calculate loss in a variety of situations; rather than opposing the text, as in *Havis*, the commentary here simply informs it. Were the commentary to be invalidated as Defendant suggests, it is not clear how anyone would calculate loss in any given situation. Certainly there would be no consistency, as all parties would simply choose the method most favorable to their case and no guidance would exist to instruct them otherwise. *Havis* requires that the text hold when it is directly opposed by the commentary; here, text and commentary work in harmony and *Havis* does not apply.

For these and the other above reasons, the proper calculation of loss for purposes of sentencing is the full amount of the government benefit diverted from its intended recipient under U.S.S.G. 2B1.1(b)(1), cmt. n.3(F)(ii), namely $11,891,243.45.

## II.     Sentencing Guideline Calculations

When fashioning an appropriate sentence for a defendant, a court must first consider the applicable guidelines range under 18 U.S.C. § 3553(a)(4). *United States v. Thompson*, 515 F.3d 556, 560 (6th Cir. 2008). Although the sentencing guidelines are advisory, they are the "starting point and the initial benchmark" for federal sentencing. *Id.* at 560-61. A court may find facts by a preponderance of the evidence when calculating the appropriate guidelines range. *United States v. Gates*, 461 F.3d 703, 707-08 (6th Cir. 2006). Once a court has determined the appropriate sentencing range, it should then consider that range in light of the other relevant § 3553(a) factors. *Thompson*, 515 F.3d at 561.

Defendant pleaded guilty to a single count of wire fraud in violation of 18 U.S.C. § 1343. The guideline for this offense is found in USSG §2B1.1. Starting from a base offense level of seven, there is an increase by 20 levels pursuant to §2B1.1(b)(1)(K) because the loss was more

9

than $9,500,000 but less than $25,000,000. In this case, the loss should properly be determined to be $11,891,243.45. After a 3 level reduction for acceptance of responsibility pursuant to USSG § 3E1.1, Defendant's total offense level is 24.

Defendant has no criminal history and as such has a criminal history score of zero. Pursuant to the sentencing table in USSG Chapter 5, Part A, this places defendant in a criminal history category of I. At an offense level of 24 and a Criminal History Category I, Defendant's advisory Guidelines imprisonment range is 51 to 63 months. Defendant's statutory maximum term of imprisonment is 20 years. 18 U.S.C. § 1343. A sentence within the Guidelines range would be sufficient, but not greater than necessary, to punish Defendant for his serious offense, deter him from engaging in future fraud, and promote respect for the law.

## III.    18 U.S.C. § 3553(a) Factors

### A.    Nature and Circumstance of the Offense

The nature and circumstances of Defendant's offense counsel in favor of a sentence within the Guideline range of 51 to 63 months. Defendant and his co-conspirators knowingly conspired to defraud the government and, in so doing, deprived from service-disabled veterans the chance to acquire contracts set aside specifically for their benefit. Service-disabled veterans are a population the government, thanks to the veterans' sacrifice of their wellbeing for the good of the country, has a particular interest in looking after. The Program was put in place in an effort to pay back the country's wounded veterans for their service and their sacrifices.

Defendant's conduct robbed the members of this vulnerable population of their chance to grow their businesses and took from the government a benefit intended to be conferred in thanks for exceptional service. Furthermore, Defendant callously used the name and person of a service-disabled veteran to effectuate his fraud. The seriousness of the offense and the cold indifference

10

to the tenuous position of service-disabled veterans displayed by Defendant advise in favor of a sentence within the Guidelines range.

  B. <u>Defendant's History and Characteristics</u>

Defendant has no criminal record and claims this case is not reflective of how he operated his business and personal life. He hired safety and quality control managers and his now-failed company Rock Industries had a good reputation. Rock's failure did occur after Defendant undertook his fraudulent scheme. Furthermore, Defendant reported he has never had a drug or alcohol problem and is currently in fair health, physically and mentally. Defendant's history and characteristics further advise a sentence within the Guidelines range.

  C. <u>The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence.</u>

A sentence within the Guidelines range would be sufficient to promote respect for the law, provide just punishment in the face of Defendant's crime, and afford adequate deterrence. Defendant engaged in a fraudulent scheme to the substantial deprivation of service-disabled veterans, redirection over $11 million from SDVOSBs for his own company's benefit. He did so while coldly aware of the falsehoods he was spreading and the service-disabled veteran whose name he was employing to pull the scheme off. As the Sixth Circuit stated in *United States v. Peppel*, "[B]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Peppel*, 707 F.3d 627, 641 (6th Cir. 2013). Furthermore, Defendant carried out his scheme over a number of years, falsely recertifying CA Services as a SDVOSB on multiple occasions and applying for contracts within the Program just as often. He could have stopped his scheme at any time, but chose not to, continuing the scheme across six major projects

11

and millions of dollars. A sentence within the Guidelines range will make clear that Defendant's behavior was patently unacceptable and that there is no tolerance for depriving benefits from vulnerable classes of people in this country.

## IV. Restitution

Pursuant to 18 U.S.C. § 3663, restitution is not applicable in this case.

## Conclusion

Accordingly, this court should sentence Defendant Kozerski to a term of imprisonment within the guideline range of 51 to 63 months.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:   /s/ Chelsea S. Rice
     Chelsea S. Rice (OH: 0076905)
     Assistant United States Attorneys
     United States Court House
     801 West Superior Avenue, Suite 400
     Cleveland, OH 44113
     (216) 622-3752 Telephone
     (216) 522-8355 Facsimile
     Chelsea.Rice@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August 2019 a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

/s/ Chelsea S. Rice
Chelsea S. Rice
Assistant U.S. Attorney